UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA L. CHEEKS,

      Plaintiff                      Civil Action No. 08-15183

v.                                HON.  JOHN FEIKENS
                                  U.S. District Judge
                                  HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## REPORT AND RECOMMENDATION

Plaintiff Linda L. Cheeks brings this action pursuant to 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Supplemental Security Income ("SSI") under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be DENIED, and that Plaintiff's Motion for Summary Judgment be GRANTED, remanding the case for further proceedings consistent with this Report.

## PROCEDURAL HISTORY

On May 9, 2005, Plaintiff filed an application for  SSI benefits, alleging an onset of disability date of June 30, 1981[1] (Tr. 60-63).  After the initial denial of the claim, Plaintiff filed a timely request for an administrative hearing, held on March 21, 2007 in Flint, Michigan before Administrative Law Judge ("ALJ") John L. Christensen (Tr. 286). Plaintiff,

_____

[1]The ALJ, noting that a previous SSI application was denied on April 27, 2004, found that the previous decision was "conclusive as to any disability up to that date" (Tr. 13).

represented by attorney Lewis Seward, testified, as did Vocational Expert ("VE") Melody Henry (Tr. 291-303, 304-308). On May 8, 2007, ALJ Christensen found that Plaintiff was capable of a significant range of unskilled work (Tr. 20). On November 21, 2008, the Appeals Council denied review (Tr. 3-5). Plaintiff filed for judicial review of the final decision on December 17, 2008.

## BACKGROUND FACTS

Plaintiff, born May 18, 1958, was a few days shy of her 49th birthday when the ALJ issued his decision (Tr. 20, 60). She quit school in 10th grade, working previously as a laborer and housekeeper[2] (Tr. 81). Plaintiff's application alleges disability as a result of Crohn's Disease and arthritis (Tr. 70).

### A. Plaintiff's Testimony

Plaintiff testified that she lived in Flint Michigan with one adult and one teenaged daughter (Tr. 291-292). Plaintiff, currently single, reported that her weight fluctuated between 170 and 191 pounds as a result of Crohn's Disease and diarrhea (Tr. 293). She noted that she continued to use a colostomy bag (Tr. 293). Plaintiff, left-handed, reported that she had never driven and did not possess a driver's license, adding that her adult daughter had driven her to the hearing (Tr. 293-294).

Plaintiff testified that she dropped out of school in 10th grade, alleging that she read only "a little bit" and wrote poorly (Tr. 294-295). She stated that arthritis had prevented her from working for over 15 years (Tr. 295). She alleged that depression affected her ability to work, noting that she took medication for both arthritis and depression (Tr. 296). She denied medication side effects except for "sharp chest pains" from codeine (Tr. 296).

---

[2]However, because Plaintiff has not worked in the past 15 years, these positions do not qualify as "past relevant work" (Tr. 117).

In response to questioning by her attorney, Plaintiff alleged constant back pain, adding that she currently took steroids (Tr. 297).  She indicated that she had been advised by her physician to exercise to relieve ankle and knee pain, noting that she was currently scheduled to be examined by a rheumatologist (Tr. 297).  Plaintiff reported that she had been using a colostomy bag for ten years (Tr. 297).  She alleged that the bag "leak[ed] a lot" and "ma[d]e funny noises" (Tr. 298).  She characterized her situation as "embarrassing," noting that it required her to "stay close to home" (Tr. 298).  Plaintiff indicated that she was required to irrigate the bag at least twice a day (Tr. 298).

Plaintiff testified that she also experienced depression to the point of suicidal ideation (Tr. 299).  She stated that "an outstanding consumer bill" that she had been unable to pay required her to move to the basement of her adult daughter's house (Tr. 300).  She alleged that back and foot pain obliged her to recline for 30 minutes at a time during her waking hours (Tr. 300).  Plaintiff reported that her depression was treated with medication and bi-weekly therapy sessions (Tr. 300).  She estimated that she could walk for only one block before her feet started "burning and swelling" (Tr. 301).  Plaintiff alleged that she was able to sit for 15 minutes and stand for 10 before requiring a change of position (Tr. 301-302).  She added that arthritis limited her manipulative and reaching abilities (Tr. 302-303).  She alleged that she was unable to lift more than seven pounds and that she climbed stairs with difficulty due to knee problems (Tr. 302).  She denied cooking or performing household chores (Tr. 303).

### B.  Medical Evidence

### 1.  Treating Sources

In December, 1993, Plaintiff sought emergency treatment for symptoms of Crohn's disease and severe anemia (Tr. 118-121, 130-131).  Plaintiff was treated with hydrocortisone

with recommendations to begin prednisone therapy and adhere to a lactose free diet (Tr. 118). She was released in stable condition (Tr. 118-119).

December, 2002 treating notes indicate that J. Tull, M.D. filled out forms on behalf of an earlier application for benefits (Tr. 175). His treating notes indicate that he believed that Plaintiff could perform "a desk job" (Tr. 175). In February, 2003, Plaintiff complained of back pain and difficulty keeping her colostomy bag in place (Tr. 174). The following month, T. Toshi, M.D. prescribed Elavil in response to Plaintiff's reports of depression (Tr. 172). In June, 2003, S. Harrison, D.O., noted that Plaintiff now reported bilateral foot pain (Tr. 161). In October, 2003, Plaintiff noted that epidural injections did not relieve back pain (Tr. 158). December, 2003 treating notes by N. Espandiari, M.D. state that a recent EMG of the lower extremities was negative (Tr. 154). Imaging studies of the chest were likewise negative for abnormalities (Tr. 176).

In March, 2004, Plaintiff reported that prednisone failed to ease her back pain (Tr. 153). In October, 2004, a psychological intake assessment indicated a GAF of 40[3] (Tr. 261). Plaintiff was referred to a psychiatrist for treatment of depression and socialization (Tr. 261). Assessment notes indicate that Plaintiff experienced social withdrawal and depression after receiving a permanent colostomy three years earlier (Tr. 260). Plaintiff was deemed "below average" intellectually with normal memory and thought processes (Tr. 259).

In January, 2005, Plaintiff, now complaining of "generalized joint pains," remarked that only Vicodin helped her pain (Tr. 147). In March, 2005, Plaintiff, again reporting generalized pain, was encouraged to keep an appointment with a rheumatologist (Tr. 146).

---

[3]A GAF score of 31-40 indicates "[s]ome impairment in reality testing or communication ... or major impairment in several areas, such as work, school, family relations, judgment, thinking or mood." *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 34 (4th ed.2000)

The same month, Debra Simmons, M.SW., opined that Plaintiff was unable to work due to depression (Tr. 144). In October, 2005, an upper GI endoscopy indicated the presence of a hiatal hernia (Tr. 219). Plaintiff was again encouraged to follow up with a rheumatologist (Tr. 220). In December, 2005, psychological treating notes indicate that Plaintiff had moved to an apartment and was up to date with her bills (Tr. 243).

In November, 2006, Plaintiff sought mental health treatment for depression (Tr. 232). She presented with average intellect with a depressed effect and poor self esteem (Tr. 230). She was assigned a GAF of 45[4] (Tr. 231). She denied recent drug or alcohol use or legal problems (Tr. 227, 229). In February, 2007, Plaintiff, reporting "less depression," was assigned a GAF of 48 (Tr. 223). April, 2007 psychiatric evaluation notes state that Plaintiff was neat and cooperative with an appropriate affect (Tr. 237). Plaintiff was assigned a GAF of 60 (Tr. 238).[5] The same month, William Foy, L.M.S.W., completed a "Mental Impairment Questionnaire" on Plaintiff's behalf, finding that she experienced poor memory, sleep and mood disturbances, and social withdrawal, due to depression and the colostomy (Tr. 262). Foy opined that Plaintiff "would not be able to show up for work on a reliable basis," but that "[i]f she stabilizes her other stressors" she would be "able to handle a part-time job" (Tr. 264). He found further that Plaintiff experienced marked restrictions in daily living, social functioning, staying within a schedule and completing a workweek without psychologically based interruptions (Tr. 265-266). He found that she also experienced moderate

_____

[4]A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR* ) (4th ed.2000).

[5], A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ) (4th ed.2000).

concentrational deficiencies (Tr. 265). Foy assigned Plaintiff a GAF of 45 (Tr. 262).

### 2. Non-Treating Sources

In June, 2005 Marianne Georgen, Psy.D conducted a psychological examination of Plaintiff on behalf of the SSA (Tr. 183-186). Plaintiff reported that she had stopped working 2003 as a result of back problems (Tr. 183). Plaintiff claimed suicidal ideation, irritability, and fatigue (Tr. 183). She exhibited fair hygiene and a "slumped" posture (Tr. 184). Plaintiff was pessimistic about the future (Tr. 184). Dr. Georgen noted that testing showed that Plaintiff exaggerated her symptoms (Tr. 184). Plaintiff was assigned a GAF of 60 with a fair prognosis (Tr. 185).

Also in June, 2005, Gregory F. Hackel, D.O. performed a physical examination of Plaintiff on behalf of the SSA (Tr. 187-190). Plaintiff reiterated that she had worked up until two years ago (Tr. 187). Noting a history of a colostomy and ileostomy as a result of Crohn's disease, Dr. Hackel noted that Plaintiff currently did not take medication for the condition (Tr. 187). Plaintiff exhibited normal grip strength and dexterity, but moderate difficulty getting on and off the examination table, heel and toe walking, and squatting (Tr. 188). Plaintiff denied the need for a cane or other ambulatory device (Tr. 190).

A Physical Residual Functional Capacity Assessment performed the following month determined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently; walk, stand, or sit for about six hours in an eight-hour workday; and push and pull without limitation (Tr. 211). Plaintiff was restricted to occasional climbing, stooping, kneeling, crouching, and crawling and frequent (as opposed to *constant*) balancing (Tr. 212). The Assessment found the absence of manipulative, visual, or communicative limitations, but found that Plaintiff should avoid prolonged exposure to hazards such as machinery or heights (Tr. 213-214). The Assessment concluded by noting that Plaintiff's allegations of disability

were "[n]ot fully credible" (Tr. 215).

Also in July, 2005, a Psychiatric Review Technique performed on behalf of the SSA determined that Plaintiff experienced an affective disorder (Tr. 191, 194). Under the "'B' Criteria of Listings," Plaintiff's daily living restrictions were deemed mild, but social functioning and the ability to maintain "concentration, persistence, and pace" were deemed moderate (Tr. 201). The same day, a Mental Residual Functional Capacity Assessment found that her ability to understand, remember, and carry out detailed instructions; "maintain attention and concentration for extended periods;" accept instruction and criticism; maintain socially appropriate behavior; and "respond appropriately" to workplace changes were moderately limited (Tr. 205-206). The Assessment, showing the absence of other significant limitations, concluded that Plaintiff was capable of performing unskilled work (Tr. 207).

### 3. Material Submitted After the ALJ's May 8, 2007 Decision

January, 2007 imaging studies showed mild degenerative arthritis of the hip joints (Tr. 282). In April, 2007, Plaintiff was treated for a bladder infection (Tr. 278). In July, 2007 Plaintiff receive a refill of Darvocet (Tr. 277). Imaging studies from May, June, and August, 2007 were unremarkable (Tr. 281). In September, 2007, Plaintiff reported ongoing back and joint pain (Tr. 276). Plaintiff received a refill of Darvocet (Tr. 276). October, 2007 imaging results of the left kidney showed a mass (Tr. 281). The same month, Plaintiff complained of level "10" pain on a scale of 1 to 10 (Tr. 276). In November, 2007, she alleged that diffuse pain in most joints created activity restrictions (Tr. 275). Plaintiff demonstrated a restricted range of motion in all directions, complaining of right hip pain (Tr. 275). Her treating source suggested avacular necrosis of the hip, possible rheumatoid arthritis, or arthropathy type II (Tr. 275). Plaintiff was advised to follow up with a rheumatologist and

-7-

was again prescribed Darvocet (Tr. 275).

In December, 2007, Plaintiff complained of level "9" back and right hip pain (Tr. 274).  Plaintiff alleged right hip/groin pain radiating into her upper leg, adding that she experienced right leg numbness and tingling (Tr. 274).   Now using a cane, Plaintiff noted that she also experienced left leg pain, numbness, and tingling (Tr. 274).  She demonstrated 4/5 power bilaterally in all extremities, in particular, showing limitations of the right leg (Tr. 274).  Reflexes were 2+ bilateral in all extremities with straight leg raising positive (Tr. 274).  Plaintiff also complained of toe and foot pain (Tr. 274).  Plaintiff was urged to take Ultram regularly, limit her use of Darvocet to pain flare-ups, and exercise (Tr. 274).

### C.    Vocational Expert Testimony

VE Melody Henry noted that Plaintiff, not yet 50, was a "younger" individual with a limited education (Tr. 305).   The ALJ posed the following question to the VE, taking into account Plaintiff's age, education, and lack of past relevant work:

> "[The] individual has the following residual functional capacity. [6]  Can lift and carry, push and pull, ten pounds frequently, 20 pounds occasionally; can stand, walk six hours out of an eight-hour day, eight-hour workday that should be; can sit at least six hours per eight-hour workday; no kneeling, crouching or crawling; only occasional stooping; no use of either lower extremity for pushing and pulling including the use of foot controls; can do simple, routine tasks only in a low stress environment.  By that I mean minimal changes in the workplace setting, and no more than occasional contact with the general public.  Given these limitations, is there work an individual could perform, and if so, please tell me what that work would be along with the occupational title, and the number of jobs available in the region.  By region I mean the [S]tate of Michigan?"

---

[6]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

(Tr. 306).  The VE stated that given the above limitations, the individual could perform the work of a hand packer (5,970 jobs in the regional economy), production inspector (2,890), and assembler (40,295)  (Tr. 306).    The ALJ then added the following hypothetical limitations:

> "as a result of pain, depression secondary to pain, fatigue secondary to pain, and medication, that individual cannot sustain sufficient concentration, persistence and pace to do even simple, routine tasks on a regular, continuing basis.  By that I mean eight hours a day, five days a week, 40 hours a week. Given those limitations, is there work an individual could perform, and if so, please tell me what work would be along with the information that I requested in my previous hypothetical"

(Tr. 306).  The VE replied that given the additional limitations, all work would be precluded (Tr. 307).

### D.    The ALJ's Decision

Citing Plaintiff's medical records and testimony, ALJ Christensen found that although Plaintiff experienced the severe impairments of Crohn's disease, arthritis, and depression, the conditions did not meet or medically equal one of the impairments found in Part 404 Appendix 1 Subpart P, Appendix No. 1  (Tr. 15-16).  The ALJ found that Plaintiff retained the following Residual Functional Capacity ("RFC"):

> "to lift, carry, push and pull 10 pounds frequently and 20 pounds occasionally, standing and walking 6 hours during an 8-hour workday, sitting at least 6 hours during an 8-hour workday with no kneeling, crouching, and crawling, with only occasional stooping with no use of either lower extremity for pushing or pulling or use of foot controls, performing simple routine tasks in a low stress environment (by that I mean minimal changes in workplace settings) and no more tha[n] occasional contact with the general public"

(Tr. 17).

Consistent with VE's job findings, the ALJ determined that Plaintiff could perform the work of an assembler, hand packer, and inspector (Tr. 19).  In support of the non-disability finding, he found that Plaintiff's "statements concerning the

-9-

intensity, persistence and limiting effects" of her conditions were "not entirely credible" (Tr. 18). He noted that Plaintiff "sought only occasional treatment for her alleged physical problems," finding that "[t]here have been few exacerbations of her Crohn's disease" (Tr. 18). In addition, the ALJ found that Plaintiff's "treatment record for 'depression' [was] also spotty" (Tr. 18).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services,* 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services,* 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

-10-

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### Vocational Expert Testimony

Plaintiff contends that remand is appropriate because the hypothetical question posed to the VE did not include workplace limitations brought on by her need to irrigate her ileostomy multiple times each day.  *Plaintiff's Brief* at 3-5, *Docket #8*. On a related note, she argues that the hypothetical question failed to account for her moderate limitations in concentration, persistence, and pace which the ALJ adopted from the Psychiatric Review Technique performed in July, 2005 (Tr. 18, 201). *Id.* at 5-6 (*citing Varley v. Secretary of Health and Human Services,* 820 F.2d 777 (6th Cir.

-11-

1987)).  She contends that the hypothetical question's non-exertional limitations of "simple routine tasks," and "low stress environment," did not accurately portray her level of concentrational and pacing impairment and thus, the VE's job findings, (adopted by the ALJ) cannot constitute substantial evidence.  *Id.*

*Varley v. Secretary of Health & Human Services*, 820 F.2d 777, 779 (6th Cir. 1987), sets forth the Sixth Circuit's requirements for a hypothetical question. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays [the] plaintiff's individual physical and mental impairments" (internal citations omitted). *Id*. at 779; *See also Webb v. Commissioner of Social Sec*. 368 F.3d 629, 632 (6th Cir. 2004).  The hypothetical question must be supported by record evidence.  However, "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals." *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)).

Substantial evidence supports the ALJ's omission of ileostomy care from the hypothetical limitations.  With the exception of  Plaintiff's June, 2005 statement to a consultive examiner that the colostomy created "difficulty at work," treatment records  do not contain indications that care of the ileostomy would create workplace interruptions[7] (Tr. 187).  In fact, the June, 2005 consultive examiner found that while Plaintiff "may have episodes requiring further treatment for Crohn's in the future . .

---

[7]While treating notes from February, 2003 suggest that Plaintiff experienced trouble keeping the colostomy bag in place, consideration of records predating the prior administrative decision (April 27, 2004) cannot be considered in the present case (Tr. 13, 174).  Further, even if relevant to the present application, the February, 2003 and  June, 2005 statements do not suggest that problems with the colostomy bag were ongoing.

. no pain [was] noted" and the ostomy was "stable" (Tr. 189).

Plaintiff submits that "[t]he simple fact remains that a colostomy bag requires regular irrigation and is prone to unexpected leakage." *Reply* at 2, *Docket #14*. However, the need for regular irrigation, by itself, does not establish disability or workplace limitations. *See Cline v. Commissioner of Social Sec.,* 96 F.3d 146, 150 (6th Cir. 1996)("colostomy patients normally adapt[] to their condition and manage[] to live very comfortably with a colostomy" (internal citations omitted)). While Plaintiff alleged that she was required to irrigate the bag at unexpected intervals multiple times each day, the ALJ permissibly found that the record did not support her claim that she experienced these complications regularly (Tr. 18).

Plaintiff contends that the ALJ did not follow through with his Step Two finding that she experienced Crohn's disease by acknowledging the condition in the hypothetical question. However, while it is true that the ALJ omitted Plaintiff's alleged need to irrigate the colostomy bag at unexpected times, the question included restrictions ("no kneeling, crouching or crawling; only occasional stooping; no use of either lower extremity for pushing and pulling including the use of foot controls") consistent with the probable exertional and postural limitations required of a colostomy patient (Tr. 306). As such, Plaintiff's physical limitations are well accounted for in the hypothetical question.

Plaintiff's argument that the hypothetical question's limitations did not comport with ALJ's ultimate finding that she experienced moderate deficiencies of concentration, persistence, and pace is a closer question. Generally, a failure to account for pacing deficiencies constitutes reversible error. *Bankston v. Commissioner*, 127 F. Supp. 2d 820, 826 (E.D. Mich. 2000)(Zatkoff, J.). Under currently used PRT terminology, "moderate"

-13-

deficiencies suggest substantial limitations which should be acknowledged in the hypothetical question. The question here is whether "simple routine tasks" and "a low stress environment," along with the condition that she must work in a atmosphere with "minimal changes," may be read cumulatively to encompass Plaintiff's non-exertional limitations (Tr. 306).

The fact that a job is simple and routine has nothing to do with whether or to what degree a worker's moderate deficiencies in concentration will affect the timely completion of that job, and indeed, courts have found such descriptions insufficient to address deficiencies in pace. *See, e.g.*, *Newton v. Chater*, 92 F.3d 688, 695 (8th Cir. 1996); *McGuire v. Apfel*, 1999 WL 426035, 15 (D. Or. 1999). Nor does the qualifier "low stress" effectively "capture the concrete consequences" of Plaintiff's limitations in pace. *Roe v. Chater*, 92 F.3d 672, 676-77 (8th Cir. 1996). Stress does not necessarily correlate with pace and the ability to complete tasks in a timely manner over an eight-hour workday.

In the present case, the hypothetical question failed to adequately encompass Plaintiff's moderate pacing deficiencies as found in the administrative decision (Tr. 18).[8] Mental status examiners in both October, 2004 and November, 2006 observed that Plaintiff exhibited some degree of "motor retardation" (Tr. 230, 259). Consistent with the treating observations, Dr. Goergen noted "slow psychomotor" skills at Plaintiff's June, 2005 consultive psychological examination performed on behalf of the SSA (Tr. 184). To be sure, the ALJ's limitations of "simple routine tasks" or "a low stress environment," along with the condition that she must work in an atmosphere with "minimal changes," are not intrinsically

---

[8] While the first hypothetical question contains no pacing limitations and the second suggests severe limitations, neither addresses the moderate deficiencies in pacing found by the ALJ>

inadequate to account for moderate deficiencies of concentration, persistence and pace. However, in the present case, both treating and consultive opinion overwhelmingly support the conclusion that Plaintiff's psychomotor impairments, *i.e.,* pacing limitations, warranted mention in the question to the VE.

The ALJ's failure to address her pacing limitations is particularly critical given the fact that the VE's job findings (hand packer, production inspector, assembler) consist exclusively of quota-driven positions[9] (Tr. 306). Plaintiff's well documented psychomotor limitations would appear to interfere with the pacing requirements of these jobs. Moreover, while *Smith v. Halter,* 307 F.3d 377 (6th Cir. 2001), is often cited for the proposition that the ALJ need not use talismatic language to avoid remand so long as the hypothetical limitations address the claimant's relative limitations, I note that in *Smith,* the ALJ's hypothetical limitations included a restriction against quotas in addition to limiting the stress level and complexity of the work. 307 F.3d at 379. Because the hypothetical question inadequately addresses Plaintiff's limitations, the case should be remanded for further proceedings consistent with this analysis. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994).

## CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, and Plaintiff's Motion for Summary Judgment GRANTED for further proceedings consistent with this Report.

Any objections to this Report and Recommendation must be filed within ten (10)

---

[9]

The DOT does not include the position of "production inspector." An exhaustive review of the DOT's many "inspector" listings indicates that the descriptions of the unskilled positions are either quota based or performed in tandem with production work.

-15-

days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir.  1991); *United States v. Walters,* 638 F.2d 947 (6th Cir.  1981).  Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation.  *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir.  1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir.  1987).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.


<u>s/R. Steven Whalen</u>
UNITED STATES MAGISTRATE JUDGE

Dated:  November 30, 2009


CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on November 30, 2009.


<u>s/Susan Jefferson</u>
Case Manager

-16-